JOSEPH W. JOHNSON, JR., AND MARGARET A. JOHNSON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5602–69, 5638–69, 5639–69.   Filed March 12, 1973.

---

[1] Proceedings of the following petitioners are consolidated herewith: H. Clay Evans Johnson and Betty Mead Johnson, docket No. 5638–69; David F. S. Johnson and Elise E. Johnson, docket No. 5639–69.

*William L. Taylor, Jr.*, and *T. A. Caldwell, Jr.*, for the petitioners.
*John M. Wylie*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in the income taxes of the petitioners for the taxable years and in amounts as follows:

| Docket No. | Petitioner | Taxable year | Deficiency |
|---|---|---|---|
| 5602-69 | Johnson, Joseph W., Jr., and Margaret A. | 1965 | $47,660.02 |
| 5638-69 | Johnson, H. Clay Evans and Betty Mead | 1965 | 42,774.26 |
| | | 1966 | 9,440.64 |
| 5639-69 | Johnson, David F. S. and Elise E. | 1965 | 50,832.04 |

Certain adjustments contained in the statutory notices of deficiency have been conceded by the respective petitioners.

The principal issue, common to each of the cases, is whether the respective petitioners realized taxable income in 1965 upon the transfer of 50,000 shares of stock, having a basis of $10,812.50 and a fair market value of $500,000, to a trust for the benefit of their children, where such stock had been pledged as collateral security for bank loans, obtained 1 or 2 days prior to such transfer, in the amount of $200,000 (in two of the cases) and $175,000 (in the other case), the notes evidencing the loans were endorsed "without personal liability," the trustees assumed payment of the loans by substituting their notes for those of the petitioners which were then stamped as paid, and the petitioners used the proceeds of the loans for their own personal purposes.

A second issue in the case of H. Clay Evans Johnson and Betty Mead Johnson is whether the petitioners therein are entitled to deduct as losses in 1965 and 1966 the cost of maintaining and operating a residence in Sea Island, Ga., in excess of rentals received.

## FINDINGS OF FACT

Joseph W. Johnson, Jr., David F. S. Johnson, and H. Clay Evans Johnson are brothers. During the years in issue, all three were active in the management of Interstate Life & Accident Insurance Co. (Interstate), located in Chattanooga, Tenn., serving as officers and members of the board of directors. H. Clay Evans Johnson was president, Joseph W. Johnson, Jr., was vice president and medical director, and David F. S. Johnson was executive vice president. Joseph W. Johnson, Jr., and his wife, Margaret A. Johnson, filed a joint Federal income tax return for the calendar year 1965 with the district director of internal revenue, Nashville, Tenn. David F. S. Johnson and his wife, Elise E. Johnson, filed a joint Federal income tax return for the calendar year 1965 with the district director of internal revenue, Nashville, Tenn. H. Clay Evans Johnson and his wife, Betty Mead Johnson, filed joint Federal income tax returns for the calendar years 1965 and 1966 with the district director of internal revenue, Atlanta, Ga. At the time the petitions herein were filed, H. Clay Evans Johnson and Betty Mead Johnson resided in Dade County, Ga., and the other petitioners resided in Hamilton County, Tenn.

On March 9, 1965, Dr. Joseph W. Johnson, Jr., borrowed $200,000 from the Hamilton National Bank in Chattanooga, Tenn. As security for such loan, Dr. Johnson signed a 30-day note dated March 9, 1965, in the amount of $200,000. On the note immediately after the signature of Dr. Johnson the words "without personal liability" were written. Such note also provided that 50,000 shares of Interstate stock were being pledged as collateral security for payment of the note.

At the same time the $200,000 note was signed, Dr. Johnson delivered to the bank as collateral security for such note two stock certificates, Nos. A-1044 and A-1046, representing 50,000 shares of Interstate stock. The two certificates were endorsed by Dr. Johnson and the space provided for the designation of the person who was entitled to have such stock transferred on Interstate's books was left blank.

On March 9, 1965, the bank established a "Direct Liability" account for Joseph W. Johnson, Jr., and made a debit to such account in the amount of $200,750. This amount represented the principal amount of the loan for $200,000 plus interest of $750 for 30 days.

794

On March 11, 1965, Joseph W. Johnson, Jr., created an irrevocable trust for the benefit of his children and transferred to it, as the corpus of the trust, all his right, title, and interest in the 50,000 shares of Interstate stock pledged to the bank as collateral security for the payment of the note of March 9. The trustees under the trust instrument were Dr. Joseph W. Johnson's wife, Margaret Austin Johnson, and the bank.

The trust agreement provided, in part:

### ARTICLE 6

#### DISTRIBUTION OF INCOME AND CORPUS

6–a. *Distribution of Income.* So much of the share of the Income of the Fund as shall be apportioned to a separate trust that is continued in trust for the benefit of a child or other descendant of Joseph W. Johnson, Jr., of David F. S. Johnson or of H. Clay Evans Johnson, as the trustees (in their sole discretion) shall deem necessary or advisable, and in the best interests of the beneficiary, shall be distributed to or used for the benefit of the beneficiary, or of the then living children of such beneficiary at such times and in such amounts as the trustees shall determine.

6–b. *Treatment of Accumulated Income.* Any income not distributed or used as above provided shall be invested by the trustees to the extent they shall deem advisable, and such accumulated income shall, at the election of the trustees, either continue to constitute income of the trust from which discretionary distribution of income may be made by the trustees, or may be transferred to corpus for handling and distribution as such.

6–c. *Distribution of Corpus.* The trustees may encroach upon the corpus of any trust hereunder, if deemed advisable for the proper support, maintenance or education of any income beneficiary thereof. Any such encroachment shall be considered an advancement and shall be charged, without interest, against such beneficiary upon any subsequent apportionment or against those beneficiaries taking such beneficiary's share of such trust.

\*　　\*　　\*　　\*　　\*　　\*　　\*

### ARTICLE 7

#### GENERAL POWERS, DUTIES AND OBLIGATIONS OF TRUSTEES AND MISCELLANEOUS PROVISIONS

7–a. *General Discretionary Powers.* The trustees shall, except as herein otherwise expressly provided, be fully empowered to lend money at interest and to receive, hold, control, manage, collect, rent, lease, sell, exchange, transfer, convey, invest and reinvest, any and every item of money and other property owned by any trust. In making any investments or reinvestments, the trustees shall not be restricted to those authorized or prescribed by any present or future law governing trust investments in the State of Tennessee or any other State.

7–b. *Specific Discretionary Powers.* In addition to the powers of the trustees under *Paragraph 7–a,* the trustees shall have the following specific discretionary powers, duties and obligations:

(1) *Diversification.* To acquire, receive and retain investments for any trust, without regard to principles of diversification, and without regard to the pre-

dominance of common stocks (or stocks in close corporations) in the trust. The trustees are specifically authorized to retain in the trusts any stock in Interstate Life & Accident Insurance Company of Chattanooga, Tennessee.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(9) *Borrowing by Trustees.* To borrow money from the commercial department of any corporate trustee serving hereunder and/or from any other source, with or without the pledge of assets of the trust estate, upon such terms and conditions as they may deem advisable.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

7–k. *Distributable Income.* Out of the annual gross income of the trust estate the trustees shall first pay all lawful taxes and all expenses properly incident to administering the trust, including the compensation to themselves as trustees as above authorized (provided that all income taxes and other taxes imposed on account of capital gains or other capital transactions hereunder shall be paid from and charged to corpus). The remainder after all proper charges thereto shall constitute the income to be expended and disposed of as hereinbefore directed.

During the months of March, April, and May of 1965, the fair market value of the 50,000 shares delivered by Dr. Joseph Johnson to the Hamilton National Bank was in excess of $500,000. The adjusted basis of Dr. Johnson in such 50,000 shares during the taxable year 1965 was $10,812.50.

On March 11, 1965, stock certificates Nos. A–1044 and A–1046 held by the bank were sent to the transfer department of Interstate so that the ownership of such certificates could be transferred to the irrevocable trust established by Dr. Johnson.

On March 12, 1965, stock certificates Nos. A–1044 and A–1046 were canceled on the books of Interstate and new certificates were issued in the name of "Hamnat & Company," a nominee of the bank used for the purpose of holding legal title to stock held by the bank as trustee. The effect of this transfer was to place ownership of the stock in the trust established by Joseph W. Johnson, Jr. The new certificates were then returned to the bank, which continued to hold them as collateral security for payment of the note of March 9.

On April 8, 1965, Margaret A. Johnson and a representative of the Hamilton National Bank, acting as cotrustees under the provisions of the Joseph W. Johnson trust, executed two notes payable to the Hamilton National Bank. One note was a 90-day note in the amount of $200,000 representing the principal of the $200,000 note signed by Dr. Johnson on March 9. As collateral security for the payment of this note, the trustees pledged the 50,000 shares of Interstate stock, the ownership of which was transferred to the trust on March 12, 1965. The second note, due June 16, 1965, was in the amount of $750 representing the interest on the $200,000 note signed by Dr. Johnson on March 9.

After the two notes of April 8, 1965, were executed by the trustees of the Joseph W. Johnson trust, the Hamilton National Bank, on May 4, 1965, stamped the $200,000 note of March 9 "Paid" and on May 6, 1965, credited the "Direct Liability" account of Dr. Johnson for a total of $200,750, thus leaving a zero balance in his account.

On May 6, 1965, a "Direct Liability" account was set up by the bank for the trustees of the irrevocable trust of Joseph W. Johnson. A debit was made thereto on May 6, 1965, for the principal sum of $200,000 plus interest.

None of the shares of Interstate stock held by the trustees were sold until January 1967, at which time 2,000 shares were sold for $27,000. In July 1967, another 2,000 shares were sold for $30,000. In September 1967, $50,000 was applied against the note.

On April 15, 1966, Joseph W. Johnson, Jr., and Margaret Austin Johnson each filed a gift tax return electing therein to have the transfers made by both parties to third parties during the calendar year 1965 considered as having been made one-half by each of them. On such returns, the transfer of the 50,000 shares of Interstate stock to the Joseph W. Johnson trust was reported. On the returns a value was assigned to such shares as of March 11, 1965. From this value was subtracted the principal indebtedness of $200,000 outstanding against such shares as of March 11, 1965. A gift tax was paid on the remaining value, i.e., the reported value of the shares less the outstanding indebtedness of $200,000. The amount of tax shown to be due on, and paid with, these returns with respect to this gift was $43,641.15 and $43,097.18, respectively.

Statutory notices of deficiency of gift tax were mailed to Joseph W. Johnson, Jr., and Margaret A. Johnson on August 13, 1969, in which notices the amounts of the proposed deficiencies were $38,536.82 and $38,539.65, respectively.

On November 8, 1969, Joseph W. Johnson, Jr., and Margaret A. Johnson filed petitions with this Court contesting the amount of deficiency shown in the statutory notices referred to in the preceding paragraph, and on November 30, 1970, decision documents were filed by the parties with this Court in docket Nos. 5601–69 and 5603–69 under which the parties have agreed to the assessment of additional gift taxes for the year 1965 in the amounts of $19,636.82 and $19,639.65, respectively.

On April 15, 1966, Dr. Joseph W. Johnson filed a State of Tennessee gift tax return. On such return, the transfer of the 50,000 shares of Interstate stock to the Joseph W. Johnson trust was reported with a value assigned to such shares as of March 11, 1965. From this value was subtracted the principal indebtedness of $200,000 outstanding

against such shares as of March 11, 1965. A gift tax was paid on the remaining value, i.e., the reported value of the shares less the outstanding indebtedness of $200,000. The amount of tax shown to be due on, and paid with, these returns with respect to this gift was $16,514.47.

On September 15, 1966, the Department of Revenue of the State of Tennessee issued a notice of assessment of additional gift taxes against Joseph W. Johnson, Jr., for the calendar year 1965 in the amount of $28,168.24, based on an increased value for the Interstate stock, which assessment was not paid.

On December 31, 1966, Joseph W. Johnson, Jr., paid additional Tennessee gift taxes for the calendar year 1965 in the amount of $4,543.24 as a result of a settlement reached with the Tennessee Department of Revenue, which settlement reflected an increased valuation placed on the Interstate stock by the Tennessee Department of Revenue.

David F. S. Johnson and H. Clay Evans Johnson each engaged in a series of transactions substantially similar to those engaged in by Joseph W. Johnson, Jr. David borrowed $200,000 from the Hamilton National Bank on March 9, 1965. Clay borrowed $150,000 on March 9 and an additional $25,000 on March 10, 1965. Each executed 30-day notes endorsed "without personal liability" and pledged 50,000 shares of Interstate stock as collateral security. The fair market value of the stock was $500,000 and the basis of each was $10,812.50. On March 11, 1965, each created an irrevocable trust for the benefit of his children, to which he transferred all his interest in the 50,000 shares of Interstate stock pledged as security for his loans and named his wife and the bank as trustees. The trust agreements were substantially similar to the one executed by Dr. Joseph Johnson. On March 12, 1965, the stock certificates delivered to the bank on March 9 by David and Clay were canceled and new certificates for 50,000 shares each were issued in the name of "Hamnat & Company," a nominee of the bank, and thereafter held by the bank as collateral security for their loans. On April 28, 1965, the cotrustees of each of the trusts executed their notes to the bank in the amounts of $200,000 and $175,000, respectively, which were used to replace the notes of the trustors, and the trustors' notes were stamped by the bank as "Paid." The cotrustees of each of the trusts also executed notes to the bank in the amounts of $750 and $650, respectively, representing the interest for 30 days which the bank had debited to the "Direct Liability" accounts established for David and Clay. The Interstate stock which had been transferred to each of the trusts was pledged as collateral security for the trustees' notes. On May 6, 1965, "Direct Liability" accounts were established for the trustees and debits made thereto for the principal sums ($200,-

000 and $175,000, respectively) plus interest. On the same date, credits were made to the "Direct Liability" accounts of David and Clay in the amounts of $200,750 and $175,650, respectively, thus leaving zero balances in each of said accounts.

In January 1967, 2,000 shares of the stock held by the trustees of the David F. S. Johnson trust were sold for $27,000 and, in October 1967, $19,275.08 was applied against their note. Also, in January 1967, 2,000 shares of the stock held by the trustees of the H. Clay Evans Johnson trust were sold for $27,000 and, in October 1967, $20,424.21 was applied against their note.

On April 15, 1966, David Johnson and his wife, Elise Johnson, filed separate gift tax returns in which they elected to have the transfers made by them in 1965 considered as having been made one-half by each of them. Separate gift tax returns were also filed by Clay Johnson and his wife, Betty Mead Johnson, on April 15, 1966, in which similar elections were made. On such returns the transfer of 50,000 shares of Interstate stock to the respective trusts was reported and a value assigned to such stock as of March 11, 1965. From this value the amount of the loan for which such stock was pledged as security was subtracted and a gift tax paid on the remainder. David and Elise Johnson each reported and paid a gift tax in the amount of $28,462.50. Clay and Betty Mead Johnson each reported and paid a gift tax in the amount of $35,212.50. On August 13, 1969, statutory notices of deficiencies were mailed to each of the above petitioners wherein deficiencies were determined in the amount of $43,012.50 each as to David and Elise Johnson and $46,462.50 each as to Clay and Betty Mead Johnson. Each of the petitioners filed petitions with this Court on November 8, 1969, contesting the deficiencies shown in such notices, and on November 30, 1970, decision documents were filed with this Court under which David and Elise Johnson each agreed to the assessment of additional gift taxes for the year 1965 in the amount of $24,112.50, and Clay and Betty Mead Johnson each agreed to the assessment of additional gift taxes for 1965 in the amount of $27,562.50.

On April 15, 1966, David Johnson also filed a State of Tennessee gift tax return on which he reported the transfer of the 50,000 shares of Interstate stock to the David Johnson trust and assigned a value thereto as of March 11, 1965. From such value he subtracted the $200,000 loan and paid a gift tax on the remainder, in the amount of $13,770. On September 15, 1966, the Department of Revenue of the State of Tennessee issued a notice of assessment of additional gift taxes against

David Johnson for 1965 in the amount of $31,625. This assessment was not paid. In 1966, as the result of a settlement reached with the Tennessee Department of Revenue, David Johnson paid additional Tennessee gift taxes for 1965 in the amount of $6,250. The State of Georgia, where H. Clay Evans Johnson and his wife reside, imposes no gift tax.

The total actual gift tax liability paid by each husband and wife couple is computed in the following table. This actual liability is the sum of all U.S. and State gift taxes paid when the petitioners' gift tax returns were filed and at a later date after settlement of the proposed deficiencies:

|  | Joseph and Margaret | Clay and Betty | David and Elise |
|---|---|---|---|
| Initial U.S. gift taxes | $86,738.33 | $70,425 | $56,925 |
| Additional U.S. gift taxes | 39,276.47 | 55,125 | 48,225 |
| Initial Tennessee gift taxes | 16,514.47 | (1) | 13,777 |
| Additional Tennessee gift taxes | 4,543.24 | (1) | 6,250 |
| Total gift taxes paid | 147,072.51 | 125,550 | 125,177 |

1 No State gift tax imposed.

On the Federal income tax returns which each husband and wife couple filed for the taxable year 1965, no report was made of any capital gains realized as the result of the transactions related above. In the statutory notices of deficiency mailed to each couple on August 13, 1969, the respondent determined that each husband and wife couple realized long-term capital gains on the above transactions to the extent that the cash received from the loans exceeded their basis in the stock transferred.

On or about August 1, 1961, the petitioners H. Clay Evans Johnson and his wife, Betty Mead Johnson, purchased a house and lot located on Sea Island, Ga., at a cost of $39,000. For purposes of depreciation, on their income tax returns for the years prior to 1965, petitioners reported the value of the house as being $35,500.

The house consisted of a front entrance hall, living room, screened porch, dining room, pantry, and kitchen on the first floor, and three bedrooms and two baths on the second floor. There was also a two-car garage with a two-bedroom apartment above the garage. The house was fully furnished and each room, as well as the garage apartment, had a window air-conditioning unit.

The petitioners had three children—two girls and a boy, who were 18, 14, and 10 years of age at the time the house was purchased in

1961. In addition to their principal residence on "The Mountain" in Chattanooga, petitioners owned stocks, bonds, and other real estate, from which they have received substantial income. Their returns for the years in issue disclosed income from salaries, dividends, taxable interest, net capital gains, tax-exempt interest, and rental income as follows:

| | 1965 | 1966 |
|---|---|---|
| Salaries | $46, 350. 00 | $52, 966. 64 |
| Dividends | 56, 031. 59 | 67, 304. 90 |
| Taxable interest | 358. 25 | 7, 902. 83 |
| Capital gains | 3, 213. 75 | 332. 81 |
| Tax-exempt interest | 2, 323. 75 | 2, 323. 74 |
| Chattanooga rental property | 884. 02 | 1, 464. 88 |

Sea Island is an island off the coast of Georgia which is approximately 5 miles long and 1 mile wide. The island is a resort area attractive to vacationers. The Sea Island Co. owns and operates a hotel on the island known as "The Cloister." There are also a number of privately owned cottages on the island, some of which are made available for rental to vacationers. The Sea Island Co. acts as agent for the owners in arranging for the rental of such cottages, for which services the Cottage Rental Department of the company charges a commission of 15 percent of the rental.

Prior to purchasing the house and lot in August 1961, petitioners and their family had vacationed at Sea Island on numerous occasions. On such occasions they had stayed at the hotel or had rented a cottage. In considering the purchase of the house on Sea Island, petitioners figured that, "at the rent they had to pay" for the rental of cottages from others, if they could acquire the property reasonably, they could pay for it and would also have property that was enhancing in value.

The Cottage Rental Department of the Sea Island Co. has acted as agent for the rental of petitioners' property since 1963. It was petitioners' practice to list their house with the Cottage Rental Department for periods of 6 months at a time. In April 1966, they listed their cottage as available for rental during the months of May through October at $1,200 per month. This included the peak rental season for property on Sea Island. Among other things, petitioners agreed:

that the cottage will not be removed from the list of houses available for rental, nor occupied unexpectedly by the owner, or friends, until he has contacted The Cloister Hotel or the Cottage Rental office to see if the house has been previously rented for conflicting periods.

No rental agreements or listings for other years were offered in evidence.

Petitioners' property was not advertised for rent either by petitioners or the Sea Island Co. Specific information relating to petitioners' place is furnished by the Cottage Rental Department only when a prospective tenant makes an inquiry and indicates a need for a cottage of the general description of this one. Most of the people renting have previously visited Sea Island or have friends who have visited there and are aware that cottages are available for rent through the rental department.

Records of the Sea Island Co. show that petitioners' cottage was rented as follows:

| Dates rented | Rent paid | Dates rented | Rent paid |
|---|---|---|---|
| Apr. 20–29, 1963 | $270 | Mar. 3–Apr. 3, 1967 | $1, 400 |
| July 1–31, 1963 | 900 | July 1–31, 1967 | 1, 200 |
| Mar. 5–Apr. 30, 1964 | 1, 500 | Aug. 5–Sept. 7, 1967 | 1, 200 |
| July 1–15, 1964 | 500 | Dec. 28, 1967–Jan. 2, 1968 | 300 |
| July 16–31, 1964 | 500 | Mar. 3–Apr. 3, 1968 | 1, 400 |
| Aug. 1–15, 1964 | 500 | Apr. 10–30, 1968 | 1, 125 |
| 1965—None shown | | July 1–31, 1968 | 1, 200 |
| Apr. 1–30, 1966 | 1, 200 | Apr. 1–30, 1969 | 1, 500 |
| July 1–31, 1966 | 1, 200 | | |

Petitioners kept no records of the dates the cottage had been occupied by them or members of their family. Admittedly it has been used by various members of the family at undisclosed times during each of the years since they have owned it. Clay liked to go to Sea Island to relax and play golf whenever he could get away. He has also entertained friends and business associates engaged in the insurance industry there. His wife and children have also entertained guests there. The following written statement furnished to respondent's agent by Clay Johnson indicates that members of his family occupied the cottage on six different occasions during the months of February, March, May, June, August, and September in 1966:

COTTAGE 97—SEA ISLAND, GEORGIA

1966

Cottage 97 was rented for two months during 1966—April & July.

This was the first year following a complete renovation of the cottage in order that tenants could be attracted.

During January of 1966 the cottage was vacant; however, from February 18 to March 27 Mrs. Johnson had several people as her guests, and it is hoped that some of them will be future renters. The guests included the Howard Willeys of Memphis, the Dr. William Blacks of Memphis, the David Hemingways of Connecticut, and the Andrews, Pattens and Smiths of Lookout Mountain.

From May 5 to May 13 the cottage was occupied by my daughter and her husband, Mr. & Mrs. Lonnie Wayne Farmer, as guests.

From June 1 to June 5 my daughter, Barbara, and a few of her friends occupied the cottage.

From June 16 to June 24 Mrs. Johnson and I occupied the cottage.

August 18 to August 22 the cottage was occupied by my daughter, Betsy, and a couple from Atlanta.

September 2 to September 8 the cottage also was occupied by members of my family.

During October, November and December the cottage was vacant.

Petitioners paid for all utilities, including electricity, water, and telephone (except long-distance calls by tenants). The utilities were kept on all the year round.

In late 1964 or early 1965 petitioners had the garage enclosed, providing a maid's room, and installed laundry equipment.

On January 18, 1965, Clay Johnson wrote the Cottage Rental Department as follows:

I received a very nice letter from Miss Wanna B. Erion concerning the job that has been done to enclose our garage and install a dryer, washer, etc. I was a bit surprised, however, to hear that so far as the cottage it would be "an injustice to offer it again for rental until it is completely refurbished."

It is true, of course, that we have not been able to get down to Sea Island for sometime. We had usually made a practice of visiting the island during the children's vacations. However, with our oldest daughter now 22 and spending the past few months in New York, with Barbara being a freshman at Sweet Briar, and Clay, Jr. at Baylor School, we as well as they have looked forward to being together at home on the mountain during these holidays. In the meantime I have had an unusually busy schedule, and we have just not been able to get away for a visit to Sea Island. I certainly hope that we will get to spend some time there before too long.

In the meantime, I wonder if you would be kind enough to give me some ideas as to what you think the cottage needs in the way of "refurbishing." The criticisms that we received in the past from cottage rentals have been primarily regarding air-conditioning and lack of laundry facilities. Though we do not have central air-conditioning, each room in the cottage as well as the garage apartment has been equipped with air-conditioning units, and we have now completed the laundry requirements.

Having just completed the laundry it seems somewhat strange that we would now get word that the cottage is just not rentable. I would appreciate hearing from you.

On January 21, 1965, the department replied as follows:

It was good to hear from you. We have wondered what had happened to the Johnsons, as it has been a long while since you and Mrs. Johnson were here, or since we heard from you. We can understand why after receiving your letter of January 18.

Wanna has written you a second letter listing in itemized form the numberous [sic] things that we feel are urgently necessary to bring the house up to Sea Island rental standards and to keep the house rented regularly. We do like repeat guests in the same cottages, and it has been quite sometime since the same families rented Cottage 97. The Nunnallys did return last summer but were not happy. A thermofax copy of Mr. Nunnally's letter to us is enclosed, as well as the one from Mr. Warner, who had your cottage last August.

Wanna and I do not mean to be derogatory in our criticism of the cottage, since actually, it has a great deal of charm structurally. In fact, there are no houses comparable to it on the Island and, to us, it becomes increasingly so with so many new brick homes going up and all so much alike from an architectural viewpoint. However, we find that the newer cottages are in greater demand from year to year simply because of nicer furnishings and modern equipment. We are jealous for Cottage 97 with its impressive structural qualities and believe that you and Mrs. Johnson would want to upgrade it so as to make the entirety appealing to everyone who enters its portals.

The location of your cottage is ideal, and there would be no trouble in keeping it rented during the rental season if it were brought up to standard.

The laundry room is fine, and we do appreciate your untiring efforts to get the job accomplished to meet that demand from the renters.

Please give these matters your thoughtful and serious consideration, and if we can be of help in any way, please do not hesitate to call on us.

Incidentally, we have no Spring rentals for the cottage up to this point.

One of the previous renters said they were "not happy with the house." The other said "The condition and equipment of the cottage left something to be desired." Both asked about other places to rent. One asked whether any improvement in the petitioners' cottage would be made prior to August 1965.

During 1965 the petitioners made additional improvements in the cottage including central heating and air conditioning, painting inside and out, and installation of new furniture, carpets, and draperies. The cottage was not rented during 1965, and the petitioners did not use it while renovation was in progress.

On their tax return for 1965 the following improvements are listed as having been made and completed in 1965:

| Nature | Cost |
| --- | --- |
| Remodeling | $5,684.23 |
| Furniture | 10,995.35 |
| Carpets and draperies | 2,957.93 |
| Central heat and air | 3,541.34 |
| Painting | 2,826.34 |
| Total cost | 26,005.19 |

The following invoices illustrate the redecorating that was done in the house:

LOOKOUT MOUNTAIN ANTIQUE SHOP

Box 26

Lookout Mountain, Tennessee

MAY 21, 1965

Mr. Clay Johnson—Sea Island Residence

| | | |
|---|---:|---:|
| Balance May 1 billing: Cabin Craft Rug | $660.00 | |
| Sales tax | 19.80 | $679.80 |
| Pair sofas @ $490 | $980 | |
| Less 10 percent | 98 | 882.00 |
| Sales tax | | 26.46 |
| Maison Tole light fixtures second floor: | | |
|    Master bedroom, 1 5-light ceiling fixture | $75 | |
|    Master bedroom, 1 1-light ceiling fixture | 30 | |
|    Master bedroom, 2 standing lamps @ $45 | 90 | |
|    Girls' room, 1 bedside lamp | 40 | |
|    2 3-light ceiling fixtures, girls and Clay's room @ $60 | 120 | |
|    2 standing lamps @ $25, girls' and Clay's room | 50 | |
|    2 pin-up lamps, Clay's room @ $16 | 32 | 437.00 |
|    Sales tax | | 13.11 |
| 4 sconces, dining room, wired | | 90.00 |
|    Sales tax | | 2.70 |
| Hexagonal vinyl tile floor per contract | | 887.00 |
|    Sales tax | | 26.61 |
| Total | | 3044.68 |

Please make check payable Lookout Mountain Antique Shop, Special and mail to Mrs. Overton Dickinson, Lookout Mt., Tenn.
[Pd 5/28/65]

1409 Oglethorpe St.               .           Telephone 265–7985
Brunswick, Ga.

R. VAN DROSKEY

MEMBER INTERNATIONAL ART RESTORERS GUILD

ANTIQUES AND ART OBJECTS RESTORED—FINE FURNITURE REFINISHING

MAY 17, 1965

Mrs. H. CLAY JOHNSON
*Lookout Mt.*
*Chattanooga, Tenn.*

To remove all existing finish, make necessary repairs, and finish in 12 coat process Barcelona blue-green with gold decoration and glazed antique over all. All surfaces hand rubbed to dull satin finish. Drop leaves to table are finished in same color both sides as they are exposed when leaves are down.

| | |
|---|---:|
| 1—10' dining table in above with black lacquer base and gate legs | $167 |
| 1—6 drawer, 2 door buffet in same finish | 155 |
| 1—Baker round coffee table w/brass trim, finished in hand rubbed black lacquer | 85 |
| | 407 |

The petitioners reported the following income and expenses on their 1965 and 1966 joint income tax returns:

Rental income 1965—none; 1966—$2,400.

| Expenses | 1965 | 1966 |
|---|---|---|
| Rental commissions | $807. 17 | $360 00 |
| Taxes | 5. 00 | 841. 03 |
| Depreciation | 4, 515. 95 | 6, 840. 64 |
| Lawn maintenance | 917. 07 | 1, 097. 50 |
| Fuel | 73. 71 | 0 |
| Telephone | 111. 15 | 133. 50 |
| Electricity | 186. 38 | 426. 37 |
| Miscellaneous | 61. 45 | 188. 90 |
| Repairs | 746. 32 | 506. 40 |
| Water | 61. 80 | 61. 80 |
| Painting | 2, 826. 34 | 230. 00 |
| Total | 10, 312. 34 | 10, 686. 14 |
| Net loss | 10, 312. 34 | 8, 286. 14 |

Depreciation was computed as follows:

| Acquired | Description | Cost | Life years | 1965 | 1966 |
|---|---|---|---|---|---|
| Aug. 1, 1961 | Property | $35,500.00 | 20 | $1,775.00 | $1,775.00 |
| June 1965 | Remodeling | 5,684.23 | 15 | 355.26 | 686.84 |
| Do. | Furniture | 10,995.35 | 6 | 1,570.76 | 2,879.73 |
| Do. | Carpets and draperies | 2,957.93 | 5 | 492.99 | 887.38 |
| Do. | Air conditioning | 3,541.34 | 10 | 321.94 | 611.69 |
| | | | | 4,515.95 | 6,840.64 |

The expenses claimed on petitioners' income tax returns for the years 1965 and 1966 covered the cost of operating the residence for 12 months in each year. No attempt was made by petitioners to allocate any portion of the expenses between personal use and expenses related to the period of time in which the house was actually rented.

The following schedule sets forth the rental receipts, depreciation, expenses, and net losses relating to the property at Sea Island, Ga., reported on petitioners' joint Federal income tax returns covering the years 1961 through 1969:

| Year | Gross receipts | Depreciation | Expenses | Loss |
|---|---|---|---|---|
| 1961 | 0 | $739.58 | $393.90 | $1,133.48 |
| 1962 | $2,851.25 | 1,775.00 | 3,015.48 | 1,939.23 |
| 1963 | 2,333.65 | 1,775.00 | 2,264.39 | 1,705.74 |
| 1964 | 3,066.00 | 1,775.00 | 4,602.57 | 3,311.57 |
| 1965 | 0 | 4,515.95 | 5,796.39 | 10,312.34 |
| 1966 | 2,400.00 | 6,840.64 | 3,845.50 | 8,286.14 |
| 1967 | 3,800.00 | 6,008.11 | 3,877.95 | 6,086.06 |
| 1968 | 4,025.00 | 5,112.57 | 625.26 | 4,712.83 |
| 1969 | 5,250.00 | 4,343.02 | 9,391.77 | 8,484.79 |

In the statutory notice of deficiency respondent disallowed the total expenses and depreciation of $10,312.34 relating to the Sea Island, Ga., property claimed on petitioners' 1965 return. For the year 1966 respondent disallowed the net loss claimed of $8,286.14. The reasons for the disallowances were stated in the statutory notice as follows:

It is held that the losses of $10,312.34 and $8,286.14, claimed in your income tax returns for 1965 and 1966, respectively, as resulting from the rental of property located at Sea Island, Georgia, are not allowable because it is determined that the property was not held primarily for the production of income during those years and that expenses in excess of income were not incurred in a transaction entered into for profit. Accordingly, taxable income for the taxable years ended December 31, 1965, and December 31, 1966, is increased $10,312.34 and $8,286.14, respectively.

### OPINION

The principal issue, common to each of these cases, is whether the respective petitioners realized taxable income upon the transfer of 50,000 shares of stock having a basis of $10,812.50 and a fair market value of $500,000 to trusts for the benefit of their respective children, where such stock had been pledged as collateral security for bank loans, obtained 1 or 2 days prior to such transfers, in the amounts of $200,000 (in two of the cases) and $175,000 (in the other case), the notes evidencing the loans were endorsed "without personal liability," the trustees assumed payment of the loans by substituting their notes for those of the petitioners which were then stamped as paid, and the petitioners used the proceeds of the loans for their own personal purposes.

Respondent determined that the petitioners in each case realized long-term capital gains to the extent that the amount of the loans obtained by them exceeded their basis in the stock transferred. The burden is upon the petitioners to show that respondent's determination is erroneous. Rule 32, Tax Court Rules of Practice.

The determination of this issue turns primarily upon the question of whether the transfers of the Interstate stock to the trusts were in part sales and in part gifts, as contended by respondent, or were merely gifts of the difference between the fair market value of the stock transferred and the loans to which the stock was subject.

Petitioners argue: (1) That "the pledging of property to secure a loan on which the borrower is not personally liable is not a taxable event for U.S. income tax purposes"; (2) that "the making of a gift is not a taxable event for U.S. income tax purposes even though the property given is subject to a loan in excess of the donor's basis for the property"; (3) that "the loan and gift were separate transactions, however, even if they are considered together, the transaction is not

taxable for U.S. Income tax purposes." Respondent's position is that "petitioners realized a taxable gain on these transactions to the extent of the excess loan proceeds over the basis in the stock transferred since (1) in substance each one of the three transactions constitutes in part a sale and in part a gift, and (2) there is no statute specifically exempting such realized gain from taxation."

We agree with petitioners that the mere pledging of property to secure a loan is not a taxable event and this is so whether or not the borrower is personally liable on the loan, since in such cases there has been no transfer of title and hence no sale or other disposition of the property. *Old Colony Trust Associates* v. *Hassett*, 150 F. 2d 179 (C.A. 1, 1945) ; 1 Mertens, Law of Federal Income Taxation, sec. 5.12 (1969 rev.). Respondent does not contend otherwise, but correctly points out that this is not an issue in the present case.

We also agree that the mere making of a gift is not of itself a taxable event for Federal income tax purposes. Where, however, as here, property is given to another subject to a loan obtained by the donor in excess of his adjusted basis in the property transferred, and the transferee pays or assumes payment of the loan, the transaction is in part a gift and in part a sale. To the extent the fair market value of the property transferred exceeds the amount of the loan it is a net gift subject only to the payment of the gift taxes thereon. To the extent, however, that the loan exceeds his basis in the property transferred it is a sale and the transferor has realized income subject to capital gain taxes.

Contrary to petitioners' contentions, the making of the loans and the transfers of the stock pledged to secure such loans to trusts for the benefit of their children were not separate unrelated transactions, but were part and parcel of an overall plan whereby the petitioners sought to realize a substantial portion of the appreciated value of the stock for themselves without tax liability, and at the same time make gifts of the stock to trusts for the benefit of their children (and thus keep the stock in the family), the gift taxes on which would be (and as ultimately determined and paid were) substantially less than their loans, and also substantially less than the excess of the loans over basis. The borrowings in each case were obtained from the same bank on the same day (except as to the $25,000 additional loan obtained by Clay Johnson on the next day). In each case a 30-day note was given for the amount of the loan, secured by 50,000 shares of Interstate stock, and the "Direct Account" of each borrower was charged with interest for 30 days. In each case the cotrustees (including the wife-petitioner) replaced the trustor's notes with their own notes within 30 days and the petitioner's notes were stamped as "paid." The cotrustees in each

case also gave their notes for the amount of the interest charged to the "Direct Account" of each of the borrowers, and such accounts were then shown as having zero balances. In each case the borrower retained the full amount of the loan obtained by him and used the proceeds thereof for his own personal purposes.

Section 61(a) of the Internal Revenue Code of 1954 [2] provides: "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including * * * (3) Gains derived from dealings in property."

Section 1001(a) provides: "The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis." And section 1001(b) provides: "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."

Section 1.1001–1(e)(1) of the Income Tax Regulations provides that "Where a transfer of property is in part a sale and in part a gift, the transferor has a gain to the extent that the amount realized by him exceeds his adjusted basis in the property."

In *Crane* v. *Commissioner*, 331 U.S. 1 (1947), the taxpayer inherited real property consisting of an apartment building and lot, the fair market value of which equaled an encumbrance to which it was then subject. She took the property subject to the mortgage but did not assume or become personally liable for the obligation. After her husband's death, she continued to operate the property for nearly 7 years, during which period she reported the gross rentals as income and claimed and was allowed deductions for taxes and operating expenses, and for depreciation on the building. The allowable depreciation during the period the taxpayer held the property was $28,045.10 and her basis in the property was reduced by this amount. Taxpayer sold the property, subject to the mortgage, to a third party for $3,000 cash, and paid $500 expenses of sale. She reported one-half the net cash as taxable gain, subject to capital gains tax, on the theory that the "property" she acquired and sold was only the equity, which had a zero value when she received it and that when she sold the equity the amount realized on the sale was the net cash, or $2,500. The Supreme Court held that "the amount of the mortgage is properly included in the 'amount realized' on the sale."

In response to the argument that the amount of the mortgage was not includable in the "amount realized" upon the transfer because

---

[2] All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

she was not personally liable on the mortgage, the Supreme Court stated:

*we think that a mortgagor, not personally liable on the debt, who sells the property subject to the mortgage and for additional consideration, realizes a benefit in the amount of the mortgage as well as the boot.*[37] If a purchaser pays boot, it is immaterial as to our problem whether the mortgagor is also to receive money from the purchaser to discharge the mortgage prior to sale, or whether he is merely to transfer subject to the mortgage—it may make a difference to the purchaser and to the mortgagee, but not to the mortgagor. Or put in another way, we are no more concerned with whether the mortgagor is, strictly speaking, a debtor on the mortgage, than we are with whether the benefit to him is, strictly speaking, a receipt of money or property. *We are rather concerned with the reality that an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations.*[38] *If he transfers subject to the mortgage, the benefit to him is as real and substantial as if the mortgage were discharged, or as if a personal debt in an equal amount had been assumed by another.* [Fns. omitted.[3] Emphasis supplied.]

Petitioners contend that the *Crane* case is not applicable in the present case for the reason that it was concerned with a sale of property and not a gift. This contention, however, ignores the well-established rule that the incidence of taxation is controlled by the substance of a transaction rather than its form.

In *Weiss* v. *Stearn*, 265 U.S. 242 (1924), the Supreme Court stated:

Questions of taxation must be determined by viewing what was actually done, rather than the declared purpose of the participants; and when applying the provisions of the Sixteenth Amendment and income laws enacted thereunder we must regard matters of substance and not mere form.

In *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945), the Supreme Court stated:

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather the transaction must be viewed as a whole and each step, from the commencement of negotiations to the consummation of the sale is relevant. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

In the *Crane* case, in holding that "the amount of the mortgage is properly included in the 'amount realized' on the sale," the Supreme Court was concerned with the economic realities of the transaction whereby the mortgagor had obtained real and substantial benefits rather than the form in which the transfer had been made.

---

[3] The Court indicated in fn. 37 that a different problem *might* be encountered if the value of the property was less than the amount of the mortgage, but stated that was not the case there. It is also not the case here.

In that case, the taxpayer had taken depreciation deductions amounting to $28,045.10 and her basis in the property was correspondingly reduced. Accordingly, under the Supreme Court's decision, when she sold the property subject to the mortgage she realized real and substantial benefits to the extent the mortgage exceeded her adjusted basis, in addition to the small amount of cash received. In the present case, the petitioners had obtained loans, in the amounts of $200,000 in two of the cases and $175,000 in the other case, for which each pledged stock having a fair market value of $500,000 and a basis of $10,812.50. They then transferred the stock to trusts for the benefit of their children. The trustees substituted their notes for those of the petitioners; petitioners' notes were stamped as paid; and their loan accounts at the bank were shown as having zero balances. We think the rationale of the *Crane* case is applicable here and that as the result of these transactions two of the petitioners realized capital gains on their stock in the amount of $189,187.50 and the other petitioner realized capital gains in the amount of $164,187.50.

The rationale of the *Crane* case has been applied by this and other Courts in situations analogous in many respects to the present case.[4]

In *Joseph B. Simon*, 32 T.C. 935 (1959), affd. 285 F. 2d 422 (C.A. 3, 1960), the taxpayer borrowed $120,000 secured by a mortgage on real property owned by him. The terms of the loan specifically provided that the lender could look only to the mortgaged property for recovery in the event of default. Three months after the loan the taxpayer conveyed the mortgaged property to Exco, a corporation in which he owned 50 percent of the common stock, for a recited consideration of $100 (which was never paid), but subject to the mortgage, the unpaid principal of which was then $119,098.22. On the date of the conveyance to Exco, taxpayer's adjusted basis in the property was $82,205.17 and the fair market value of the property was substantially in excess of the mortgage indebtedness. The taxpayer claimed

---

[4] For articles relating to the *Crane* case, and the income tax consequences of the transfer of property subject to encumbrances in excess of the transferor's adjusted basis, see: Berl, "Disposition of Property Mortgaged in Excess of Basis," 19th Ann. N.Y.U. Tax Inst. 1033, 1040–1045 (1961) ; Note, "Assumption of Indebtedness by a Donee—Income Tax Consequences," 17 Stanford L. Rev. 98 (1964) ; Comment, "Income Tax Consequences of Gifts of Property Encumbered in Excess of Basis," 7 U.C.L.A. L. Rev. 770, 772–779 (1960) ; Del Cotto, "Basis and Amount Realized Under Crane: A Current View of Some Tax Effects in Mortgage Financing," 118 U. Pa. L. Rev. 69 (1969) ; Lowenstein, "Federal Tax Implications of Gifts Net of Gift Tax," 50 Taxes 525 (1972). Contra, Spears, "Mortgages in Excess of Basis," S. Cal. Tax Inst. 883 (1959), but note criticism thereof in 7 U.C.L.A. L. Rev., *supra* at 775 fn. 16.

See also Rev. Rul. 70–626, 1970–2 C.B. 158, which held on authority of *Crane* v. *Commissioner*, 331 U.S. 1 (1947), that "a gift or donation of property pledged to secure a debt, the amount of which is less than the fair market value of such property, is a transfer of property in part a sale and in part a gift within the meaning of section 1.1011–1(e) of the regulations."

that the transfer of the property was a nontaxable contribution of capital under the 1939 Code. This Court held that the transfer was in substance a sale to the extent of the difference between the amount of the mortgage indebtedness and taxpayer's basis.[5]

In *First National Industries, Inc.* v. *Commissioner*, 404 F. 2d 1182 (C.A. 6, 1968), affirming a Memorandum Opinion of this Court, certiorari denied 394 U.S. 1014 (1969), the taxpayer, one of six corporations owned and controlled by a seventh nonprofit charitable corporation (Foundation), obtained a bank loan in the amount of $750,000 for which it pledged as security 1,000 shares of stock it owned in an entirely separate company. Its basis in this stock was $100,000. Taxpayer transferred this stock to Foundation, which took it subject to the loan. Foundation sold the stock to the issuing company for redemption, receiving $250,000 in cash and the company's note in the amount of $705,374.29. Foundation sold the note to the bank and advanced $700,000 of the proceeds to a subsidiary. This subsidiary made payments on its indebtedness to three other subsidiaries. They in turn made payments on their indebtedness to the taxpayer, and taxpayer paid off its note to the bank in the amount of $700,000. It was held that the original transfer of the stock by the taxpayer to its parent corporation was basically equivalent to a sale and that the taxpayer realized capital gain on the transaction. In so holding, the Court of Appeals (p. 1186) stated:

A donor taxpayer is not chargeable for income on account of a gift of property which has appreciated in value over the base at which he held it (Humacid Co., 42 T.C. 894, 913 (1964)), but where donated property continues to be subject to a mortgage a gain may result to the donor under certain circumstances. Joseph B. Simon, 32 T.C. 935 (1959), aff'd, 285 F. 2d 422 (3rd Cir. 1960). Since the amount of the mortgage on property is part of its sale price even though the purchaser does not assume the mortgage (Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 67 S. Ct. 1047, 91 L. Ed. 1301 (1947)), because the purchaser will be required in some way to discharge the mortgage, a transfer of property subject to such a mortgage may in substance constitute a receipt by the transferor of the amount of the mortgage on the property if the transferee does in fact pay the indebtedness secured by the mortgage. * * *

In *Malone* v. *United States*, 326 F. Supp. 106 (N.D. Miss. 1971), affirmed per curiam 455 F. 2d 502 (C.A. 5, 1972), the taxpayer conveyed farmland having an adjusted basis of $13,650 and a fair market value of $57,485 to an irrevocable trust for the benefit of his grandchildren, subject to two loans which he had previously obtained from the Federal Land Bank of New Orleans in the total amount of $32,000,

---

[5] See also *Magnolia Development Corp.*, 19 T.C.M. 934 (1960).

secured by the farm property. The trustees accepted the trust property subject to the mortgage indebtedness and thereafter paid annual installments on the bank loans from rental income received from the lease of the farmlands. The taxpayer used the proceeds of the bank loans for his own personal purposes unrelated to the trust property. It was held that the transfer of the mortgaged property to the trust was a *gift* to the extent of the value of the property in excess of the debt and was a taxable *sale* to the extent of the difference between the mortgage debt and the taxpayer's adjusted basis in the property.

The present case is similar in many respects to the *Malone* case and requires a similar conclusion. For Federal income tax purposes, it is immaterial whether the stock was transferred subject to the loans or whether the transferees assumed payment of the loans. In either case, as a matter of economic reality, the transferees must see to it that the loans are paid in order to protect their equity in the stock. In either case the benefit to the transferor was "real and substantial." *Crane* v. *Commissioner, supra; First National Industries, Inc.* v. *Commissioner, supra.*

We hold that the transfers in question constituted in part a gift and in part a sale. To the extent that the fair market value of the stock transferred by each of the petitioners exceeded the amount of his loan it was a gift subject only to the payment by him of the gift taxes thereon, which have been paid and are not an issue herein. To the extent the transfers were subject to the loans they were sales and petitioners each realized capital gains in the amount his loan exceeded his basis in the stock.

*Richard H. Turner*, 49 T.C. 356 (1968), affirmed per curiam 410 F. 2d 752 (C.A. 6, 1969), relied upon by petitioners, does not require a different conclusion. In that case, the taxpayer transferred certain shares of stock to her children and to trusts for the benefit of her grandchildren, on condition that the various recipients pay their pro rata share of the resulting gift tax liabilities which in each instance exceeded the donor's basis. It was held that the donor intended and in fact made a net gift to each recipient in the amount of the value of the shares transferred less the amount of the gift taxes and that the transfers were not part sales and part gifts.

The instant case is distinguishable from the *Turner* case both on the facts and the issues presented. The transfers in the present case were not conditioned on the payment of the gift tax liabilities by the recipients and no issue involving the payment of gift taxes is presented herein. Nor was there any reservation or retention by the donors in the present case, of any right or interest in the corpus or income of the

trusts such as was found by the Court in the *Turner* case. Nor, in our opinion, are the loans in the present case to be equated with the gift tax liabilities in the *Turner* case. The record herein does not support petitioners' statement, on brief, that "the loans incurred were simply enough to meet possible U.S. and Tennessee gift tax liabilities." As shown by the schedule of gift taxes set forth in our findings, the total gift taxes paid by Joseph and Margaret were $147,072.61; total gift taxes paid by Clay and Betty were $125,550; and the total gift taxes paid by David and Elise were $125,177. Their loans exceeded the gift taxes, as initially reported by them and ultimately paid, by $52,927.49, $49,450, and $74,823, respectively. Petitioners have offered no explanation for such excesses if the only purpose of the loans was to secure money with which to pay their gift tax liabilities. Finally, unlike in the *Turner* case, we have found, on the basis of all the facts presented and consonant with the authorities hereinbefore discussed, that the transfers here in question were in reality part sales and part gifts.

## The Sea Island Property

The remaining issue concerns the petitioners H. Clay Evans Johnson and Betty Mead Johnson only. On their income tax returns for 1965 and 1966, they claimed deductions in the amounts of $10,312.34 and $8,286.14, respectively, as net losses incurred in connection with the maintenance and operation of a residence at Sea Island, Ga. Respondent determined that the deductions claimed were not allowable because the property was not held primarily for the production of income during those years and the expenses in excess of income were not incurred in a transaction entered into for profit. In the absence of any rental income from the property for the year 1965, the entire amount of the depreciation and expenses claimed for that year was disallowed. For the year 1966, the amount disallowed represented the excess of the total depreciation and expenses claimed ($10,686.14) over the $2,400 of rental income received from the property for that year.

Petitioners have the burden of establishing that respondent's determination is erroneous. Rule 32, Tax Court Rules of Practice; *Carkhuff* v. *Commissioner*, 425 F. 2d 1400 (C.A. 6, 1970), affirming a Memorandum Opinion of this Court; *Drybrough* v. *Commissioner*, 376 F. 2d 350, 360 (C.A. 6, 1967), affirming on this point 42 T.C. 1029 (1964).

The issue presented is whether the petitioners are entitled to the expense and depreciation deductions under the provisions of sections 162, 167, and 212 of the Internal Revenue Code of 1954, the

applicable portions of which are set forth in the margin.[6] The resolution of this issue requires a determination of whether the acquisition and holding out of the Sea Island property for rental purposes by petitioners constitutes a "trade or business" or whether that property was "held for the production of income," within the purview of the above sections.

It is recognized that the holding of a single property for rent may constitute a trade or business, *Anders I. LaGreide*, 23 T.C. 508, 512 (1954), *Leland Hazard*, 7 T.C. 372 (1946); also that property held for rental purposes may be held for the production of income within the provisions of section 212, *William C. Horrmann*, 17 T.C. 903 (1951). In determining whether the holding of property for rental is a trade or business within the meaning of section 162, or is a holding of property for the production of income within the meaning of section 212, the intention of the taxpayers as to the use of the property is of paramount importance.

In order for the petitioners to be entitled to recover herein, it was necessary that they demonstrate they had a profit-seeking motive in acquiring and holding the Sea Island property. If the predominant purpose and use of the property was for recreation, a hobby, or some other nonprofit motive, rather than to derive income, they are not entitled to the deductions claimed. *Carkhuff* v. *Commissioner, supra;* sec. 1.212–1(c), Income Tax Regs. See also *Schley* v. *Commissioner*, 375 F. 2d 747 (C.A. 4, 1967), affirming a Memorandum Opinion of this Court; *Marcell N. Rand*, 34 T.C. 1146, 1150 (1960). While the absence of a profit is not necessarily determinative, the operation must be of such a nature that in good faith, the taxpayers could expect a profit. *Carkhuff* v. *Commissioner, supra; Lamont* v. *Commissioner*,

---

[6] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. * * *

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or
(2) of property held for the production of income.

SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

* * * * * * *

(2) for the management, conservation, or maintenance of property held for the production of income; * * *

339 F. 2d 377 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court. See also *Henry P. White*, 23 T.C. 90 (1954), affirmed per curiam 227 F. 2d 779 (C.A. 6, 1955), certiorari denied 351 U.S. 939 (1956).

Whether the petitioners acquired and held the Sea Island property for rent primarily for the purpose of making a profit is a question of fact to be determined from all the facts and circumstances of the case. No single factor is controlling but greater weight is to be given to objective facts than to the taxpayer's mere expression of intent.

Prior to their purchase of the house and lot on August 1, 1961, petitioners and their children had vacationed at Sea Island on numerous occasions. On such occasions they had either stayed at the Cloister Hotel or had rented a cottage. In answer to the question "What made you get into this particular piece of property?" Clay testified:

Sir, I have been to Sea Island on several numerous occasions, as a matter of fact, before that, as a renter, myself. I have stayed at the Cloister, and I have also rented cottages. And I figured at the rent I had to pay, if I stood on a piece of property, I could acquire ressonably, I would be able to—not only one day be able to pay for it, but I would have a property that was enhancing in value every year.

Later, on cross-examination, he testified:

We bought it with the idea that we were going to rent the house, and if once in a long time, the house would not be rented and we could go, we did.

Petitioner was equally imprecise and unclear in his testimony concerning other matters. At no time did he precisely and clearly state that he bought the Sea Island property for the primary purpose of making a profit. Considering all of the facts and circumstances, including the factors hereinafter discussed, we are convinced that petitioners bought the property primarily in order to minimize their vacation expenses and to recoup some of the cost of maintaining and operating a vacation home of their own.

Petitioner had no knowledge and apparently made no investigation prior to purchasing the property to determine whether the property had ever been rented by the former owner, or if so, for how much.

The rental agreements which petitioners entered into with the Cottage Rental Department of the Sea Island Co. did no more than to make petitioners' cottage available for rental by the Cottage Rental Department as petitioners' agent, at such times as it was not being used or occupied by petitioners, members of their family, or friends. Petitioners agreed not to remove the cottage from the list of houses available for rent or to occupy the cottage unexpectedly without notice. They were at liberty, however, to use the property themselves at

any time they chose except when it was actually occupied or contracted for by a renter.

Petitioners' property was not advertised for rent either by petitioners or the Sea Island Co. Specific information relative to petitioners' place was furnished by the Cottage Rental Department only when a prospective tenant made an inquiry and indicated a desire to rent a cottage of the general description of this one.

Petitioners paid all expenses for the maintenance and operation of the property as a vacation home, including the maintenance of the grounds and all utilities such as electricity, water, and telephone (except long-distance calls by tenants). The utilities were kept on all the year round. No allocation was made of any of the claimed expenses between the times the property was used by petitioners or members of their family, and the periods when the cottage was actually rented.

It does not appear from the evidence presented that petitioners kept any books of record showing the expenses of maintaining and operating the property or of the income received from rentals, such as would normally be expected of one engaged in a transaction for profit. The only evidence relating to the rental of the property was information obtained from the rental cards maintained by the Cottage Rental Department showing the dates the cottage was rented and the rent paid therefor, during the period from April 20, 1963, to April 30, 1969. There is no evidence as to when the property may have been rented prior to April 20, 1963.

Petitioners admitted they kept no records of the times the cottage was occupied by them or members of their family. The statement given to respondent's agent by Clay, relating to use of the property by members of his family in 1966, was evidently prepared by him from memory after the investigation of the returns herein was begun. Clay's testimony that he and members of his family used the property an average of only 1 month out of each year since it was purchased in 1961 is hardly acceptable, particularly for the years 1961, 1962, and 1963 when the children were young and it might reasonably be expected the family would vacation together and they had only recently purchased a vacation home of their own in a highly desirable resort area. The property was not used by them in 1964 as much as in prior years, apparently because the oldest daughter was in New York for a number of months, the youngest daughter was a freshman at Sweet Briar, and the son was attending Baylor School. Also Clay had an unusually heavy schedule during this year. The eye trouble for which the mother, Betty Mead Johnson, later underwent operations for cataracts, may also have been a factor.

As to the year 1965, petitioner testified, and the records of the Cottage Rental Department indicate that the cottage was not rented during this year. Clay testified it was not rented, or used by him or members of his family, during the entire year 1965, because of the renovations or improvements being made. The invoices for new rugs, draperies, lamps, and the refinishing of furniture were dated in May 1965, and petitioners' returns state the remodeling, etc., was "acquired" in June 1965. We think it reasonable to presume that improvements such as painting, plastering, installation of central air conditioning and tile flooring were completed prior to the installation of new rugs, draperies, and furnishings. Petitioner's testimony does not convince us that the property was not usable by them, or rentable, after June 1965.

We are also not convinced that the improvements in question were made primarily for the purpose of making a profit. The extent and quality of the improvements, including expensive rugs, sofas, and draperies, and 12 coats of hand-rubbed finishing on furniture, belie such a purpose. The rental of the property for only 2 months during the taxable year 1966, the year following the improvements, and the use of the property by members of the family on six different occasions, for a total of 73 days in 1966, is contraindicative of a profit motive for such extensive outlays.

Other factors to be considered, though not of themselves controlling, are the financial status of the petitioners and the standard of living to which they were accustomed. The petitioners are obviously persons of substantial means and accustomed to living in pleasant surroundings. Their principal residence was located at 1300 Scenic Highway on Lookout Mountain. In 1965, even after transferring 50,000 shares (valued at $500,000) of income-producing stock to trusts for the benefit of their children in March 1965, they had income in excess of $109,000, and in excess of $132,000 in 1966. Although the improvements made to petitioners' Sea Island property no doubt made it more attractive to potential renters, the extent and character of the improvements are more indicative of an intention to satisfy their personal tastes and comfort rather than of an intent to make a profit. *Carkhuff* v. *Commissioner, supra.*

Considering all of the facts and circumstances, we hold that the Sea Island property was not acquired by petitioners or held by them during the taxable years primarily for the purpose of making a profit and accordingly, they are not entitled to the deductions claimed in excess of the amount allowed by respondent.

*Decisions will be entered for the respondent.*