LESTER W. LINDOW and ANDREE LINDOW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lindow v. Commissioner
Docket No. 8610-74.
United States Tax Court
T.C. Memo 1978-301; 1978 Tax Ct. Memo LEXIS 215; 37 T.C.M. (CCH) 1257; T.C.M. (RIA) 78301; August 1, 1978, Filed Werner Strupp, for the *216 petitioners. Frank J. Coyne, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the following years in the following amounts: Year
Deficiency
1971
$ 1,564.23
1972
1,138.75
The sole issue for our determination is whether petitioners' activities in connection with their condominium apartment were activities primarily engaged in for profit. If so, the expenses incurred therein are deductible under either section 162 or section 212. [1] If not, petitioners are limited to those deductions under section 183 allowed by respondent in the notice of deficiency. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Lester W. Lindow (hereinafter Lester) and Andree Lindow (hereinafter Andree), husband and wife, resided in Washington, D.C., when they filed the petition in this case. They *217 filed timely, joint Federal income tax returns for the calendar years 1971 and 1972 with the District Director, Internal Revenue Service, Baltimore, Maryland. For approximately 20 years, Lester has been the Executive-Director of the Association of Maximum Service Telecasters, whose headquarters is in Washington, D.C. During the years in issue, he reported salary income of approximately $ 50,000 per year. Petitioners also reported other income from dividends and interest. While vacationing in Florida in August 1966, petitioners became interested in purchasing property there. They investigated various pieces of real estate but found none satisfactory at that time. Petitioners returned to Florida for a vacation in August 1967, and, after considering other properties, they decided to purchase a condominium apartment [hereinafter referred to as the condominium] in Palm Beach, Florida. Before finally making the purchase, they inquired as to the rental market with a local real estate firm, they consulted a financial counselor as to the advisability of the purchase, and they obtained the services of an experienced local attorney who represented them at the closing. Petitioners *218 purchased the condominum in November 1967 for $ 46,224.45. This condominium is the only residential property petitioners own. They financed the purchase by making a cash down payment and obtaining a long-term mortgage for the remaining portion (approximately 66 percent) of the cost. They liquidated this mortgage in early 1973. Petitioners purchased $ 10,654.73 worth of furnishings for the condominium in 1967. Aside from the Florida area, petitioners had considered purchasing property in Palm Springs, california, and around Phoenix and Scottsdale, Arizona. Lester was 54 in 1967, and these three areas, Florida, Southern California, and Arizona, were also areas to which he had considered eventually retiring. After purchasing the condominium, petitioners engaged the services of real estate agencies to assist them in renting it. From August 1971 until July of 1976, Gerard J. Yonkman, Inc., Realtors [hereinafter Yonkman], represented petitioners with respect to rentals. Under the exclusive agency rental agreement executed by petitioners as owners and Yonkman as exclusive agent, petitioners agreed to pay Yonkman 10 percent of all gross rentals. In return, the agreement required *219 Yonkman to do the following: 1. To draw up all lease agreements using the EXCLUSIVE AGENT'S own lease agreement and submit the lease agreement to the owner for approval and acceptance.
2. To carefully inspect said property, secure complete information regarding said property and list the property at the price and terms stated herein with their organization. 3. To direct the concentrated efforts of their organization to secure a tenant. 4. To advertise said property as the EXCLUSIVE AGENT deems advisable in local newspapers or periodicals, and/or other mediums of advertising they may deem of merit, or by signs approved by the OWNER and in accordance with local laws. 5. To furnish and report at all times additional information requested by any Realtor or real estate broker, and to assist co-operating brokers in closing a lease transaction on said property when requested to do so.
6. To promptly pay any co-operating Realtor or broker who secures a tenant for said property. 7. To keep the OWNER informed through the salesman in charge as to the progress being made toward the consummation of a transaction, and, periodically discuss with the OWNER all matters of importance *220 which the EXCLUSIVE AGENT may deem pertinent to the present or future rental of said property. 8. The EXCLUSIVE AGENT will submit as much information regarding a tenant prospect as is available to him including any references, and, will upon request order a credit report if the Owner deems this necessary. Such credit report will be at the expense of the OWNER. 9. The EXCLUSIVE AGENT will inspect the OWNER'S property at the termination of the lease for any obvious damages which may or may not be other than normal wear and tear and report any such damage, if any, to the OWNER. 10.The EXCLUSIVE AGENT will, if requested by the OWNER employ a maid for general cleaning of the premises before and/or after a tenant has occupied the premises. 11. The EXCLUSIVE AGENT will collect all rental moneys due the OWNER, and forward same to the OWNER. The agreement contains no provision regarding sale of the condominium. Up to the time of trial, the condominium had not been listed for sale with a real estate broker, and petitioners have neither advertised it for sale nor requested brokers to so advertise it. The real estate agents, such as Yonkman, have arranged the advertising *221 for the rental of the condominium. Newspaper articles offering it for rent were placed largely in local Florida newspapers. The petitioners have not seen all the advertisements purchased by their real estate agents. The prime rental season for condominiums and apartments in the Palm Beach, Florida area is from early January until late March with a recent trend for the prime rental season to extend into early April. Although the condominium is listed for rent on a year-around basis, rentals are realistically practical only during this period. The condominium was actually rented for the following periods during the years 1968 through 1975 inclusive: Year
Dates of Rental
1968
Feb. 10 - Apr. 10
1969
Jan. 7 - Feb. 7
1970
Feb. 1 - Mar. 31
1971
Feb. 1 - Mar. 28
1972
Jan. 4 - Apr. 30
Nov. 17 - Dec. 31
1973
Jan. 1 - Mar. 17
1974
No Rentals
1975
No Rentals
The following rental schedule for the condominium, which was adopted by petitioners after consulting with their rental agents, has remained substantially unchanged since 1968, and was in effect during the years in issue: December, April
$ 1,750/mo.
January, February, March
2,000/mo.
Full year
12,000/yr.
*222 The following schedule shows the rental income, claimed expenses, and net losses from the condominium, for the years 1968 - 1975. 1968
1969
1970
1971
1972
INCOME
Rental Income
$ 3,000 $ 2,000 $ 4,000 $ 5,200 $ 5,344 EXPENSES
Agent's Commis-
sion
500 600 0 0 0 Depreciation
3,168 2,693 2,783 2,442 2,508 Insurance
92 111 67 38 183 Interest
1,626 1,481 663 340 221 Rental Ex-
penses
586 407 3,352 3,582 2,950 Repairs &
Maintenance
1,420 1,473 673 892 784 Replacements
22 47 0 0 0 Taxes - Real
Estate
829 878 895 765 830 Utilities
180 244 288 348 331 Total Expenses
$ 8,423 $ 7,934 $ 8,721 $ 8,407 $ 7,807 NET PROFIT/LOSS
(5,423)
(5,934)
(4,721)
(3,207)
($ 2,463)
1973
1974
1975
INCOME
Rental Income
$ 5,231 0 $ 1,500 (Advanced pay-
ment for 1976)
EXPENSES
Agent's Commis-
sion
0 0 150 Depreciation
2,223 1,965 2,282 Insurance
74 78 57 Interest
68 0 0 Rental Ex-
penses
2,309 2,678 2,597 Repairs &
Maintenance
2,308 2,021 2,586 Replacements
0 0 0 Taxes - Real
Estate
958 837 871 Utilities
262 521 222 Total Expenses
$ 8,202 $ 8,100 $ 8,765 NET PROFIT/LOSS
(2,971)
(8,100)
(7,265)
*223 The expenses claimed by petitioners were determined by multiplying expenses by a fraction the numerator of which is the number of days in the year the condominium was not used for personal purposes by petitioners, and the denominator of which is the total number days in the year.
Petitioners maintained records of the trips they took to the condominium and their activities when present. These indicate that petitioners used the condominium for 2,472 hours or 103 days during 1971, and 1,967-1/2 hours or 82 days during 1972. Of this total, 84 days during 1971 and 65 days during 1972 were for personal use; and the remainder of the time was largely spent either traveling between Florida and Washington, D.C., or with maintenance functions including cleaning, painting, repairs, and the like which were performed by petitioners or others employed by them. ULTIMATE FINDINGS OF FACT Petitioners' activities in connection with their condominium during the years in issue were not primarily engaged in for profit. OPINION Petitioners purchased a condominium in Florida during 1967 which they personally occupied for substantial periods during the years in issue. Although petitioners have *224 offered the condominium for rent and listed it with rental agents, expenses have consistently exceeded income. Petitioners seek to deduct these losses for the taxable years 1971 and 1972 under either section 162 or section 212. For the losses to be deductible under either section, petitioners must prove that their activities in connection with the condominium were engaged in primarily to produce a profit. Carkhuff v. Commissioner,425 F. 2d 1400 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Hirsch v. Commissioner,315 F. 2d 731 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Jasionowski v. Commissioner,66 T.C. 312, 319 (1976). Respondent contends that petitioners' activities with respect to the condominium were primarily personal rather than profit oriented and, therefore, that the expenses so incurred are deductible only to the extent allowed under section 183. [2] See section 1.183-2(a), Income Tax Regs. We, therefore, must determine whether petitioners' activities in connection with the condominium were primarily engaged in to produce a profit. *225 This is basically a factual issue. Carkhuff v. Commissioner,supra;Lamont v. Commissioner,339 F. 2d 377 (2d Cir. 1964), affg. a Memorandum Opinion of this Court. In resolving it, we must consider all the facts and circumstances of the case with no single factor afforded controlling weight. Section 1.183-2(b), Income Tax Regs.; Johnson v. Commissioner,59 T.C. 791 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974). After carefully weighing all the evidence with these standards in mind, we conclude that petitioners' activities were not primarily engaged in to produce a profit, and, therefore that they are limited solely to those deductions under section 183 allowed by respondent in the notice of deficiency. Several factors, no one in itself controlling, compel this conclusion. First, petitioners incurred substantial losses in connection with the condominium for each of the years 1968 through 1975 inclusive. [3] Such substantial, repeated losses, even after the initial years of operation indicate that the operation was not primarily profit oriented. See Bessenyey v. Commissioner,45 T.C. 261 (1965), *226 affd. 379 F. 2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967).[4] This is especially true where, as here, petitioners have neither shown changes in past operating practices in order to prevent their continued losses, nor attempted to attribute the losses for the years in question to causes unforeseen when they originally purchased the condominium. See section 1.183-2(b)(6), Income Tax Regs.
A second, related factor is the manner in which petitioners operated the condominium. Petitioner Lester testified that the prime rental season in the Palm Beach area when the condominium was purchased was from January *227 through March, with a recent trend toward rentals in early April also. He further stated that only during this period were rentals reasonably to have been expected, and the rental history of the condominium clearly supports this.[5] Yet the rental rates petitioners set--$ 2,000/month for January, February, and March and $ 1,750/month for April and December-- would produce only $ 6,000 to $ 7,750 in yearly income assuming the condominium to be fully rented for the entire prime rental season. By contrast, petitioners annually claimed expenses associated with the condominium of between $ 7,807 and $ 8,765. "Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit." Section 1.183-2(a), Income Tax Regs.Carkhuff v. Commissioner, 425 F.2d at 1404; Johnson v. Commissioner,59 T.C. at 814. We fail to understand how, under these circumstances, petitioners could have in good faith intended to generate a profit. *228 A third relevant factor is the amount of time during which petitioners themselves used the condominium as a vacation home. See Carkhuff v. Commissioner,supra. The condominium was rented for a total of 186 days during the years in issue (56 in 1971 and 130 in 1972), while petitioners used it for a total of 188 days (103 days in 1971 and 85 days in 1972). While some of petitioners' use was in connection with maintenance, their purely personal use was also substantial (84 days in 1971, and 65 days in 1972). Additionally, the maintenance also served petitioners' personal reasons for owning the property and those personal reasons were predominant. A fourth factor is the "presence of personal motives" in their ownership of the Palm Beach condominium. Section 1.183-2(b)(9), Income Tax Regs. It was used both by petitioners and by those to whom they rented it as a vacation home, and petitioners used it on occasion to entertain friends. Petitioners' interest in purchasing property in Florida arose during vacations there in the summer of 1966 and 1967. We also find it significant that petitioners considered purchasing property in the three areas of the country (Arizona, *229 Florida, and Southern California) where they considered eventually retiring. In fact, Lester, who was 54 years of age when the apartment was purchased, expressed a present intent to retire to the Palm Beach, Florida area. Considered together with other facts and circumstances in this case, we believe petitioners purchased and rented the property in question to minimize their vacation expenses and recoup some of the condominium's cost, and with a longer range view toward choosing an eventual retirement home.
Nevertheless, petitioners contest our conclusion, emphasizing a number of factors they allege support their position. In particular, petitioners stress their prepurchase investigation of the local rental market and their discussions with "experts." However, we note that after their investigation petitioners rented the condominium at rates which, as previously discussed, would yield a net loss on the property even if it were rented for the entire prime rental season. Since petitioners were thus presumably aware of the state of the rental market, the rates which could reasonably be charged, and the rental season, and further, since petitioners have not attributed their history *230 of losses to unforeseen contingencies (at least prior to 1974), "[the] inference is against the possibility that the resulting 'losses' reflected simply an unwise investment." Carkhuff v. Commissioner,425 F.2d 1400, 1404 (6th Cir. 1970), affg. a Memorandum Opinion of this Court. Petitioners next suggest that they anticipated an eventual resale profit on the property due to its appreciation in value. However, there is no evidence that petitioners have ever actually intended to dispose of the condominium after it appreciated in value. Petitioners neither offered it for sale nor did they solicit offers through real estate firms. At trial, Lester was confused as to the terms of his exclusive agency agreement regarding sale offers obtained by Yonkman. The text of this agreement, as stipulated by the parties, contains no clause what-soever regarding sale of the property. In light of Lester's testimony, petitioners' use of the condominium, and their retirement plans, we believe that the hope of realizing an eventual resale profit played at most a minimal role in their purchase and ownership of the condominium. As we have recently stated, "if the anticipation of *231 eventually selling * * * at a profit were in itself sufficient to establish that the property was held with a profit-making intent, rare indeed would be the homeowner who purchased a home several years ago who could not make the same claim." Jasionowski v. Commissioner,66 T.C. 312, 323 (1976). [6]
Finally, petitioners place considerable emphasis upon their maintenance of detailed records. However, records, regardless of how detailed, are insufficient to permit the deduction of what are essentially personal expenses. Eg. Lamont v. Commissioner,339 F. 2d 377 (2d Cir. 1964), affg. a Memorandum Opinion of this Court. Whatever probative weight this factor would have in a different factual context, the weight of the evidence favoring respondent's position overshadows its significance herein. In conclusion, we again note that the question before us is purely factual and depends upon the entire record, not just isolated facts. After carefully considering all the evidence in light of the arguments advanced, we agree with respondent's position that petitioners' activities *232 during 1971 and 1972 in connection with their condominium were not engaged in primarily for profit. Therefore, petitioners are not entitled to deductions under section 162 or 212, but rather are limited to those deductions permitted under section 183 which respondent allowed in the notice of deficiency. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise noted.↩
2. Sec. 183 provides, in pertinent part, that: (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. * * *
(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.-- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Sec. 280A, which was added by sec. 601 of the Tax Reform Act of 1976, 90 Stat. 1569-72 is not applicable to the taxable years before us, 1971 and 1972. See generally Kaplan, "Deductions for 'Vacation Homes' Under the Tax Reform Act of 1976," 63 A.B.A.J. 1302↩(1977).
3. Petitioners object on the basis of relevancy to the admission into evidence of their income and expenses from the condominium for the years 1973, 1974, and 1975. While we would reach the same result on the record before us even without regard to this evidence, we believe that such evidence is relevant in determining petitioners' intent during the years in issue. Hence, this evidence is admissible. Abrams v. United States,449 F.2d 662↩ (2d Cir. 1971). 4. See also Lyons v. Commissioner,T.C. Memo. 1977-239↩.
5. Lester testified at trial that: [The] height of the season runs January, February, March and now is extending a little bit into April. * * *
* * * [Realistically] in that part of the country the season for rental is pretty much at the time-- height of the season. Once this magic chop-off time, which I referred to earlier, occurs, the exodus is fantastic.↩
6. See also Eisenstein v. Commissioner,T.C. Memo. 1978-95↩.