HERBERT B. COPELAND and ELAINE COPELAND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Copeland v. Commissioner
Docket No. 1642-78.
United States Tax Court
T.C. Memo 1980-476; 1980 Tax Ct. Memo LEXIS 107; 41 T.C.M. (CCH) 253; T.C.M. (RIA) 80476; October 23, 1980, Filed Theodore W. Hirsh,James N. *108 Schuth and Harold Altscher, for the petitioners. R. Dale Eggleston, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner, in his statutory notice, determined a deficiency of $1,537 in petitioners' Federal income tax for their taxable year 1975. The issue is whether petitioners' operation of their beach cottage (hereinafter the cottage) for that year was an "activity * * * not engaged in for profit" within the meaning of section 183(a), Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. The petitioners filed their joint Federal income tax return for the taxable year 1975 with the Internal Revenue Service Center at Philadelphia, Pennsylvania. At the time they filed their petition in this proceeding, they resided in Baltimore, Maryland. From approximately 1954 through 1966, petitioners vacationed at seaside resorts in Ocean City, Maryland, *109 and Rehoboth, Delaware, about once every two years. Their stays at Rehoboth never exceeded a weekend; those at Ocean City were for up to two weeks. Petitioners vacationed for more frequently at Caribbean resorts during these years. While vacationing at Ocean City in the mid-1950's, Petitioner Herbert Copeland (hereinafter Dr. Copeland) rented a cottage from one Ray Jarvis, a real estate agent. Jarvis suggested to Dr. Copeland that the latter might be interested in purchasing an ocean-front block of property in Ocean City for $40,000. Dr. Copeland had been in practice for only a few years at the time and was unable to afford the land; however, his interest in ocean-front property was stimulated, and he watched the value of the lot rise, over the years, from $40,000 to what he claimed was about $6 million. By the mid-1960's, when his financial position had sufficiently improved, Dr. Copeland began looking for an ocean-front lot that he could afford, that would appreciate in value, that would generate current income, and that he and his family could use for personal recreational purposes. Various relators showed petitioners properties in South Bethany and Rehoboth, Delaware, *110 but the area they became most interested in was Ocean Village, a small beach-front community in Southern Delaware which was in the early stages of development. The houses being constructed there were designed by architects and were thus more attractive, in petitioners' view, than the usual "box-type" beach house prevalent in tourist meccas such as Ocean City. In 1966, petitioners considered purchasing a lot in Ocean Village but eventually concluded that the asking price of $12,700 was too high. After further searching they returned to Ocean Village in 1967 and discovered that the lot's price had risen to $15,500. This substantial appreciation convinced petitioners that the lot was an excellent investment. Accordingly, in 1967 they acquired the property and had a cottage built upon it. In terms of his investment criteria, Dr. Copeland felt that the lot and cottage were more expensive than he would have liked, but (as he had been assured by local real estate agents) would rent well and would appreciate in value beyond his initial investment expectations. The cottage is a single dwelling frame structure of modern design on an ocean-front lot. It is fully air conditioned, provided *111 with baseboard heat and a fireplace. It is not insulated and is uninhabitable from November through March. The cottage is nicely decorated and the petitioners are constantly upgrading its furnishings. Every year after 1967, petitioners have listed their cottage with an agent for rental to third persons for the period from the last week in June through Labor Day. They have never attempted to rent the cottage for any other period. Petitioners have never either personally, by friends, or by family, used the cottage during the time it has been listed for rental. In addition to listing the property with real estate agents, Dr. Copeland himself solicits rental.
The prime rental season in Ocean Village is from the last week in June through Labor Day. Prior to and following this time, properties are rented, but for only one-half to two-thirds of the prime season rates. Dr. Copeland estimated that prior to the last week in June, no more than five or six of the 71 houses in Ocean Village are rented. Lifeguards are on duty at the beach in front of the cottage only during the prime rental season. Petitioners have little trouble renting the cottage in July and August; they do have trouble *112 finding tenants for the last week in June and the week prior to Labor Day. Petitioners do not attempt to rent the cottage during the off-season because the lower rentals available at that time would, in their view, not justify the increased wear and tear, and because, in their opinion, off-season tenants generally are of lower quality and hence inflict more damage on the premises. Petitioners and their friends and relatives do spend time each year at the cottage during the off-season. Petitioners first visit the cottage for a weekend in April to "open" it. They remove the wooden storm "doors" and "windows" which protect the glass doors and windows during the winter. Various furnishings are taken out of storage and replaced, and the cottage is generally cleaned up.To ready the cottage for the rental season, much further work must be done for which there is insufficient time on opening weekend. Hence, petitioners return to the cottage on one or two weekends, and for a full week in June, prior to the prime rental season. The purpose of these visits is to ready the cottage for rental, to get it in the best possible condition for the tenants. After the prime season, petitioners visit *113 the cottage on one or more weekends during September and October and for a full week in September to perform similar cleaning, maintenance, and repair tasks, and finally to close the cottage for the winter. Petitioners work up to six or seven hours a day performing these chores, but on the average spend from three to five hours per day. On three of the weekends petitioners spend at the cottage each year, they are accompanied by one of their children. Dr. Copeland's brother-in-law has used the cottage about three times since petitioners acquired it, and his mother-in-law stays with petitioners there about two weekends per year. On one or two weekends a year, petitioners lend the cottage to a friend or relative. The children and mother-in-law are expected to work when they stay at the cottage. Petitioners hire third parties to perform major maintenance tasks such as painting the whole cottage or draining the water pipes. However, the minor chores, in the aggregate, require much more time than do the major ones. While staying at the cottage, petitioners and family play as well as work. They enjoy sitting and sunbathing on the sundeck, swimming, and surf fishing. The water *114 temperature at the cottage in early June is 60 to 61 degrees; by mid-June it is about 65, rising to 68 by the end of that month. Dr. Copeland finds the water too cold to swim in until late June; according to him, people who swim earlier than that (e.g., in May or February) are "polar bears." The water temperature in September is in the 70's which he finds comfortable. In his view September has the best weather of the year there. The water temperature drops back into the 60's in October. Although the weather and water temperatures in September are good, rentals are difficult to make because beach cottages are primarily rented to families and younger children return to school after Labor Day. Dr. Copeland is a physician; he and his wife reported the following amounts of adjusted gross income for their taxable years 1968 through 1975: Adjusted
Taxable Year
Gross Income
1968
$ 66,199
1969
76,144
1970
68,396
1971
79,435
1972
82,735
1973
99,090
1974
95,700
1975
68,384
The following schedule shows the petitioners' items of gross income and deduction attributable to the cottage for their taxable years 1968 through 1975: ITEM
1968
1969
1970
1971
Rental Income
$ 2,099
$ 1,513
$ 2,313
$ 2,077
Expenses: Depreciation of
Improvements to land
2,847
2,528
2,251
1,951
Taxes
114
171
174
175
Interest
1,592
1,539
1,482
1,423
Depreciation of
Furnishings
1,649
1,235
901
675
All other
1,063
897
1,132
1,280
TOTAL EXPENSES
7,265
6,370
5,940
5,504
Net Income (loss)
(5,166)
(4,857)
(3,427)
10% Personal Use [2]
0
0
0
550
Loss Reported per Return
$ (5,166)
$ (4,857)
$ (3,627)
$ (2,877)
*115 ITEM
1972
1973
1974
1975
Rental Income
$ 2,199
$ 3,350
$ 2,925
$ 1,735
Expenses: Depreciation of
Improvements to land
1,690
1,465
1,322
1,198
Taxes
159
154
151
147
Interest
1,359
1,395
1,115
1,143
Depreciation of
Furnishings
947
1,164
810
672
All other
1,889
2,144
1,846
2,005
TOTAL EXPENSES
6,044
6,322
5,244
5,165
Net Income (loss)
(3,845
(2,972)
(2,319)
(3,430)
10% Personal Use [2]
604
214
185
201
Loss Resported per Return
$ (3,241)
$ (2,758)
$ (2,134)
$ (3,229)
*116 As a result of petitioners' use of the cottage each year prior to and subsequent to the period that it is held for rental to third parties, an Internal Revenue Service agent, in connection with an audit of petitioners' 1969 return, proposed that they be charged with 10 percent of the expenses of the cottage, representing personal use. Since then, in preparing their Federal income tax returns, petitioners have reduced their expenses for the property by 10 percent in order to comply with the recommendation.
The cottage had an initial cost for land and improveents (exclusive of furnishings) of $38,275. It was appraised in March 1979 at $135,000 by a local real estate firm. Respondent, in his statutory notice, determined that petitioners' operation of the cottage was an activity not engaged in for profit and accordingly disallowed all of their deductions attributable to the cottage in excess of their rental income therefrom, and further disallowed an investment tax credit they claimed for some furnishings they purchased for the cottage. OPINION We are called on to decide whether petitioners' ownership and operation of their cottage was an activity engaged in for profit during *117 1975. Should we find in the affirmative, we must then determine the percentage of the depreciation and operating expenses of the cottage which is properly attributable to petitioners' personal use thereof. The pertinent part of section 183 of the Internal Revenue Code of 1954 provides: (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit * * *, there shall be allowed-- (1) the deductions * * * allowable * * * for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or * * * 212. The standard for determining whether an individual *118 is carrying on a trade or business so that his expenses are deductible under section 162, or whether he is engaged in activities for the production of income or for the management, conservation, or maintenance of property held for the production of income so that his expenses are deductible under section 212, is: did the individual engage in the activity with the predominant purpose and intention of making a profit? Allen v. Commissioner,72 T.C. 28, 33 (1979). Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into or continued the activity with the objective of making a profit. In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of intent.Sec. 1.183-2(a), Income Tax Regs.Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. The list is not exclusive and no one factor is determinative. Rather, all facts and circumstances with respect to the activity are to be considered. Sec. 1.183(b), Income Tax *119 Regs. Based upon this standard, we conclude that petitioners purchased and rented their cottage with the expectation of making a profit. Before explaining why we decide for petitioner, we feel constrained to discuss respondent's essential arguments. Respondent contends that petitioners' vacations in Ocean City and Rehoboth constitute a prior history of enjoyment of the same activity presently alleged to be engaged in for profit, which he correctly points out tends to show a non-profit motive. Johnson v. Commissioner,59 T.C. 791, 815 (1973), affd. 495 F.2d 1079 (6th Cir. 1974).However, the record shows that petitioners' trips to these resort areas prior to 1967 were infrequent, occurring about once every two years, and that they primarily vacationed on Carribean islands. Thus, there is little, if any, "prior history" in this case. Compare these facts with those of Johnson, where petitioners vacationed on "numerous occasions" at the same resort island on which their private beach cottage was later located. 59 T.C. at 800. More aptly, respondent points to the petitioners' substantial losses each year from current operations. It *120 is true that unexplained, continued losses may indicate the lack of a profit motive. Sec. 1.183-2(b)(6), Income Tax Regs. But it is obvious from the record that Dr. Copeland was interested as much in long-term appreciation as in current income. Section 1.183-2(b)(4) provides that: [the] term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend * * * that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. * * *. Dr. Copeland did not purchase the land until he was certain of its potential for appreciation, as evidenced by its rise in value between 1966 and 1967. And it has appreciated very substantially since then. In this connection respondent asserts that petitioners' costs of carrying the property were not subsidized through the rental process because the rental income never exceeded expenses other than for interest, property taxes, and depreciation of improvements to the land. There is insufficient *121 evidence in the record to determine whether the rental activity did or did not subsidize the carrying costs. Even if petitioners were holding the cottage purely for appreciation in value, they would still have needed to incur a significant amount of maintenance expense, which should properly be allocated to carrying, and not rental, costs. It may well be that the rentals received, less costs actually attributable thereto, did indeed offset carrying costs. Respondent maintains that petitioners did not carry on their rental enterprise in a businesslike manner, indicating an absence of profit motive. Sec. 1.183-2(b)(1), Income Tax Regs. He notes that petitioners, in the face of repeated losses, continued to rent the cottage only during the prime rental season. Yet, Dr. Copeland's decision not to rent in the off-season was clearly business related.He felt that the cottage would be even less profitable if it were rented during this time, due to increased wear and tear from lower-quality tenants and to the significantly lower rentals. Also, petitioners listed the cottage for rental with a real estate agency and Dr. Copeland himself solicited rentals. Petitioners did not use the *122 cottage at any time during the period which they considered best for renting, and kept the cottage nicely furnished in order to attract the quality of tenant they desired. We find that petitioners conducted their rental operations in a business-like manner. The fact that the taxpayer devotes much of his personal time and effort to an activity may indicate that it is engaged in for profit. Sec. 1.183-2(b)(3), Income Tax Regs. Respondent argues that petitioners did not spend much time in operating their rental property. The record is replete, however, with testimony about the numerous and tedious maintenance tasks petitioners performed to ready the cottage for rental. The fact that major repairs were done by third parties did not make the petitioners' efforts any less laborious or essential. Respondent points to the personal use of the cottage made by petitioners and their family and friends, and to the fact that such personal use was one of Dr. Copeland's motives in acquiring the property, as indicating the lack of a profit motive. It is true that "[the] presence of personal motives in [the] carrying on of an activity may indicate that the activity is not engaged in for *123 profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs. The same regulation goes on to state: It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit * * *. An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. * * * We acknowledge that one of petitioners' purposes in acquiring the cottage was to have a facility which they could use personally, and that they did make some recreational use of it. However, the nature and quantity of their personal use was not sufficient to characterize the activity as not engaged in for profit. First, petitioners and their family used the cottage only for two full weeks and several weekends each year. They spent much of their time there performing essential maintenance. Use by their friends was sporadic and infrequent. Second, and most important, neither they nor their friends made any use whatsoever of the property during the prime rental season, when it was held out exclusively for rental to third parties. Petitioners made a legitimate, *124 rationally-based business decision not to rent the cottage at other times. Due to the cold water temperatures prior to late June, the start of grade school after Labor Day, and the sharply reduced market rentals, we find it quite likely that petitioners would have received relatively few rentals while suffering increased wear and tear to the cottage during the off-season. We do not feel that their decision can be attributed simply to a desire to make the facility available for their own use. Finally, it is true, as respondent notes, that Dr. Copeland's substantial income from outside sources tends to negate a profit motive. Sec. 1.183-2(b)(8), Income Tax Regs.
Nevertheless, the factors favoring the opposite conclusion convince us of petitioners' bona fide intent to make a profit. Petitioners searched at length for beach-front property which would appreciate in value, purchasing their lot only after learning of a substantial increase in its selling price over a one-year period. They were also assured by local real estate agents that the cottage would generate current income, thus satisfying another investment objective. Once acquired, the petitioners operated the cottage *125 in a business-like manner, listing it for rental with agents, soliciting rentals themselves, and holding the property out for rental for the entire prime season. It is true that petitioners suffered repeated losses from current operations, yet it is also true that the property continued to appreciate in value and that petitioners' personal use thereof was minimal. As we said in Allen v. Commissioner,72 T.C. 28, 36 (1979): Although the petitioners have sustained substantial current losses, they still hope, in the long run, to realize a profit because the fair market value of the lodge has appreciated * * *. The appreciation in value may, or may not in fact, offset the aggregate operating losses, but the prospect of realizing a profit on the sale of the lodge was bona fide when Mr. Allen decided to invest in the lodge and is sufficient to explain his willingness to continue to sustain operating losses. * * * We conclude that petitioners acquired and oprated their cottage with the objective of making a profit. We next consider what portion of the petitioners' depreciation and operating expenses attributable to the cottage should be charged to their personal *126 use. This inquiry is purely factual, sec. 1.183-1(d)(3)(ii), Income Tax Regs., and under all of the facts and circumstances appearing of record, we find the ten percent figure which petitioners have been using to be reasonable. The 60 percent figure that respondent argues for is clearly unjustifiable. As noted above, petitioners' personal use was ancillary to their maintenance activities, which consumed much of their time spent at the cottage. And it would be hardly fair to charge them with, as personal use, other time in the offseason when the cottage was unoccupied due to their business decision to rent only during the prime season. Petitioners of course are fully entitled to deductions allowable without regard to whether the activity giving rise to them is profit motivated, e.g., interest (section 163) and taxes (section 164).The investment tax credit which petitioners claimed for 1975 must be reduced by ten percent to reflect personal use. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. The parties stipulated to all figures contained in this chart as well as to the assertions in the paragraph following it. Apparently, the personal use amounts for 1971-72 were based upon total expenses, whereas the ones for 1973-75 were based upon "all other" expenses. However, the record contained a copy of petitioners' 1975 return from which it appears that the figures for depreciation in the chart ($1,198 and $672) result from a separate 10 percent reduction in total depreciation expenses. Thus, at least for 1975, petitioners reduced all expenses except taxes and interest (which are deductible independently of their connection with a profit-oriented activity) to reflect personal use. It is possible that a similar procedure was followed for 1973 and 1974, and that the reductions for 1971 and 1972 were excessive. As none of these latter four years is before us, we express no opinion as to these matters.↩